UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

JONATHAN BENJAMIN FLEMING,

          Plaintiff,

    v.

CAROLYN COLVIN, et al.,

          Defendants.

Case No. 16-CV-00162-LHK

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING COMMISSIONER'S CROSS-MOTION FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 20, , 23

Plaintiff Jonathan Fleming ("Plaintiff") appeals a final decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff's application for a period of disability and disability insurance benefits under Title II of the Social Security Act. Before the Court are Plaintiff's motion for summary judgment, ECF No. 20 ("Pl. Mot."), and the Commissioner's cross-motion for summary judgment, ECF No. 23 ("Comm. Mot."). Having considered the parties' briefs, the relevant law, and the record in this case, the Court hereby DENIES Plaintiff's motion for summary judgment and GRANTS the Commissioner's cross-motion for summary judgment.

## I.    BACKGROUND

### A.    Plaintiff's Age and Educational, Vocational, and Medical History

1

Plaintiff was born on July 27, 1983. *See* ECF No. 12 (Administrative Record, or "AR"), at 92. Plaintiff has a college education, and Plaintiff worked for four years as an engineer of combat vehicles at BAE Systems. *See id.* at 48–49. Prior to Plaintiff's job as an engineer, Plaintiff had a summer job selling and installing alarm systems, and a summer job working at Home Depot Company. *See id.* at 50–51.

On August 13, 2009, Plaintiff's vehicle was rear-ended by a vehicle going in excess of sixty miles per hour. *Id.* at 355. As a result of the accident, Plaintiff alleges "injury to eight spinal discs, severe, horrible pain, muscle spasm, and thoracic outlet syndrome," in addition to anxiety. *Id.* at 92.

**B.  Procedural History**

On April 23, 2012, Plaintiff filed a Title II application for a period of disability and disability insurance benefits. *Id.* at 79. The claim was denied initially on November 28, 2012, *see id.* at 81, and was denied upon reconsideration on June 19, 2013, *see id.* at 92. Plaintiff filed a written request for a hearing on June 24, 2013. *Id.* at 98. A hearing was held on February 13, 2014. *See id.* at 38. On March 28, 2014, the ALJ issued a written opinion finding Plaintiff was not disabled and therefore not entitled to benefits. *Id.* at 17–32.

Plaintiff appealed the ALJ's decision to the Appeals Council, who denied Plaintiff's appeal on November 5, 2015. *Id.* at 1. Plaintiff timely filed a complaint seeking judicial review of the Commissioner's decision in this Court on January 11, 2016. ECF No. 1.

On November 8, 2016, Plaintiff filed a motion for summary judgment. Pl. Mot. On January 9, 2017, the Commissioner filed a cross-motion for summary judgment and opposition to Plaintiff's motion for summary judgment. *See* Comm. Mot. On January 17, 2017, Plaintiff filed a reply. ECF No. 24 ("Pl. Reply").

**II.  LEGAL STANDARD**

**A.  Standard of Review**

This Court has the authority to review the Commissioner's decision to deny benefits. 42

1 U.S.C. § 405(g). The Commissioner's decision will be disturbed only if it is not supported by

2 substantial evidence or if it is based upon the application of improper legal standards. *Morgan v.*

3 *Cmm'r of Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999); *Moncada v. Chater*, 60 F.3d 521,

4 523 (9th Cir. 1995). In this context, the term "substantial evidence" means "more than a mere

5 scintilla but less than a preponderance—it is such relevant evidence that a reasonable mind might

6 accept as adequate to support the conclusion." *Moncada*, 60 F.3d at 523; *see also Drouin v.*

7 *Sullivan*, 966 F.2d 1255, 1257 (9th Cir. 1992). When determining whether substantial evidence

8 exists to support the Commissioner's decision, the court examines the administrative record as a

9 whole, considering adverse as well as supporting evidence. *Drouin*, 966 F.2d at 1257; *Hammock*

10 *v. Bowen*, 879 F.2d 498, 501 (9th Cir. 1989). Where evidence exists to support more than one

11 rational interpretation, the court must defer to the decision of the Commissioner. *Moncada*, 60

12 F.3d at 523; *Drouin*, 966 F.2d at 1258.

**B.      Standard for Determining Disability**

14          Disability benefits are available under Title II of the Social Security Act when an eligible

15 claimant is unable "to engage in any substantial gainful activity by reason of any medically

16 determinable physical or mental impairment . . . which has lasted or can be expected to last for a

17 continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

18          "ALJs are to apply a five-step sequential review process in determining whether a claimant

19 qualifies as disabled." *Bray v. Comm'r of Soc. Sec. Admin*, 554 F.3d 1219, 1222 (9th Cir. 2009).

20 At step one, the ALJ determines whether the claimant is performing "substantial gainful activity."

21 20 C.F.R. § 404.1520(a)(4)(i). If so, the claimant is not disabled; if not, the analysis proceeds to

22 step two. *Id.* At step two, the ALJ determines whether the claimant suffers from a severe

23 impairment or combination of impairments. 20 C.F.R. § 404.1520(a)(4)(ii). If not, the claimant is

24 not disabled; if so, the analysis proceeds to step three. *Id.* At step three, the ALJ determines

25 whether the claimant's impairment or combination of impairments meets or medically equals an

26 impairment listed in the Listing of Impairments ("Listing"), 20 C.F.R. § 404, subpt. P., app. 1. 20

3

C.F.R. § 404.1520(a)(4)(iii). If so, the claimant is disabled; if not, the analysis proceeds to step four. *Id.* At step four, the ALJ determines whether the claimant has the residual functional capacity ("RFC") to do his or her past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If so, the claimant is not disabled; if not, the analysis proceeds to step five. *Id.* At step five, the ALJ determines whether the claimant can do other jobs in the national economy. 20 C.F.R. § 404.1520(a)(4)(v). If so, the claimant is not disabled; if not, the claimant is disabled. "The burden of proof is on the claimant at steps one through four, but shifts to the Commissioner at step five." *Bray*, 554 F.3d at 1222.

## III. DISCUSSION

Plaintiff challenges the ALJ's determination that Plaintiff is not entitled to benefits. First, Plaintiff argues that the ALJ failed to provide "specific and legitimate" reasons supported by "substantial evidence" in the record to reject the more restrictive RFC evaluations of Plaintiff's treating and examining physicians. Pl. Mot. at 18–23. Second, and relatedly, Plaintiff argues that because the ALJ failed to offer specific and legitimate reasons supported by substantial evidence to reject the more restrictive RFC evaluations of Plaintiff's treating and examining physicians, the ALJ's RFC determination was not based on substantial evidence. *Id.* at 26–29. Third, Plaintiff contends that the ALJ failed to provide "clear and convincing" reasons for finding Plaintiff's subjective reports of his functional limitations to be less than credible. *Id.* at 23–26. Fourth, Plaintiff asserts that the ALJ failed to properly consider Plaintiff's obesity. *Id.* at 26. Finally, Plaintiff asserts that the ALJ failed to reconcile the differences between the vocational expert's ("VE") testimony and the Dictionary of Occupational Titles ("DOT"), which lists the physical requirements of various job titles. *Id.* at 27–28.

The Court first summarizes the relevant record evidence and the ALJ's written opinion. The Court then discusses each of Plaintiff's arguments.

### A. Relevant Record Evidence

The Court begins by summarizing the relevant record evidence regarding Plaintiff's

impairment. The Court first discusses relevant medical evidence regarding Plaintiff's physical limitations, and then discusses the relevant medical evidence regarding Plaintiff's non-physical limitations. Lastly, the Court addresses the relevant non-medical evidence of Plaintiff's limitations.

### 1. Medical Evidence Regarding Plaintiff's Physical Limitations

#### a. Thomas Johnson, M.D. (Treating Physician)

On August 14, 2009—the day after Plaintiff was rear-ended in a car accident on August 13, 2009—Plaintiff saw Dr. Thomas Johnson ("Dr. Thomas Johnson") at a "minor injury clinic." AR 330–31. Plaintiff told Dr. Johnson that he was in a "high-impact" car accident, but that the airbags did not deploy. *Id.* Plaintiff complained to Dr. Thomas Johnson of "severe neck pain and stiffness, and mod[erate] low back pain and stiffness." *Id.* at 331. Dr. Thomas Johnson noted that Plaintiff had painful range of motion in all directions, with flexion/extension to 25 degrees. *Id.* Dr. Thomas Johnson reported that Plaintiff had a "[n]ormal neurologic exam of extremities" and that Plaintiff "d[id] not appear to be seriously injured." *Id.* Dr. Thomas Johnson prescribed Percocet and told Plaintiff to rest and avoid painful movements. *Id.*

#### b. Kelli Andrea Johnson, M.D. (Treating Physician)

Plaintiff first visited Dr. Kelli Andrea Johnson ("Dr. Johnson") on August 17, 2009, four days after Plaintiff's car accident. *Id.* at 343. Dr. Johnson noted that Plaintiff was 6'1" and weighed 276 pounds, and Dr. Johnson described Plaintiff as "overweight." *Id.* Plaintiff complained to Dr. Johnson of "neck pain, back pain, headache with sensitivity to light," and right "shoulder pain with radiation down the arm." *Id.* at 344. Dr. Johnson described Plaintiff as "well appearing, and in no distress." *Id.* Dr. Johnson found that there was "significant tenderness over spasming muscle" in Plaintiff's neck, primarily on the right side. *Id.* Dr. Johnson found that Plaintiff's "motor and sensory grossly normal bilaterally, normal muscle tone, no tremors" with 5/5 strength. *Id.* Dr. Johnson found that there was an "abnormal exam of right shoulder with decreased [range of motion] due to pain." *Id.* Dr. Johnson ultimately found "no significant

5

abnormality." *Id.* at 345. She prescribed Plaintiff a muscle relaxer and referred Plaintiff to physical therapy. *Id.*

Plaintiff visited Dr. Johnson again on August 27, 2009 and reported that he stopped taking his pain medication because "[h]e did not like the way the Percocet was making him feel." *Id.* at 346. Plaintiff also stopped taking the muscle relaxer because it "seemed to be making [Plaintiff] tired." *Id.* Plaintiff complained to Dr. Johnson of "new pain in the mid-back area," though Plaintiff had no weakness in his lower extremities, no saddle numbness, and no problem with urinary or bowel movements. *Id.* at 347. Dr. Johnson performed a back exam and found that Plaintiff had a "full range of motion, no tenderness, palpable spasm, or pain on motion." *Id.* She noted tenderness over Plaintiff's spine, but "normal reflexes and strength bilateral lower extremities." *Id.* She found diffuse tenderness throughout Plaintiff's neck "noted over tight cervical muscles." *Id.* She advised Plaintiff to restart the muscle relaxer at half the dose and to follow up with physical therapy as planned. *Id.* at 348.

Plaintiff saw Dr. Johnson again on November 10, 2009 and December 21, 2009. Plaintiff told Dr. Johnson that he "ha[d] been doing swimming, [physical therapy], stretching, water therapy, [and] spa therapy," and had lost ten pounds. *Id.* at 408–09. Plaintiff complained of "popping in the neck on the [left] side," which was causing pain down Plaintiff's arm. *Id.* at 417. Dr. Johnson "strongly encouraged [Plaintiff] to stay active" and "discussed considering getting [Plaintiff] back to at least part time in one month" depending on whether his work could accommodate him. AR 409–10.

Plaintiff returned to Dr. Johnson on March 9, 2010 for Dr. Johnson to fill out disability paperwork for Plaintiff. *Id.* at 428. Plaintiff told Dr. Johnson that Plaintiff "returned to work but when he did, he was told by his employers that they did not want him to return to work until he was 100%, as they feel he is still a liability because he moves and works slowly." *Id.* Plaintiff told Dr. Johnson that his employer wanted Plaintiff "to take the full 6 months off and return after that." *Id.* Dr. Johnson thought that this was "a grossly inappropriate request" and that "this [was]

setting [Plaintiff] up for potential life-long disability." *Id.*

On May 24, 2010, Plaintiff saw Dr. Johnson for a possible sexually transmitted disease after Plaintiff "started having intercourse with his girlfriend again." *Id.* at 439.

### c. Dhiruj Ram Kirpalani, M.D. (Examining Physician)

Plaintiff saw Dr. Dhiruj Ram Kirpalani ("Dr. Kirpalani") for a consultation on September 30, 2009. *Id.* at 355. Plaintiff complained of pain in his neck, upper, and lower back, with radiating pain down his right lower extremity. *Id.* at 356. Plaintiff reported that he also experienced pain bilaterally down his lower extremities in his posterior thigh and "fire in [his right] ankle." *Id.* Plaintiff stated that the average pain severity was 5-6/10, and that it was "worse with sitting." *Id.* Plaintiff had no upper or lower extremity weakness. *Id.* Dr. Kirpalani reported that Plaintiff "appear[ed] in moderate distress due to pain" and that he was "[e]xhibiting a lot of pain behaviors." *Id.* at 357. Dr. Kirpalani found tenderness in Plaintiff's trapezius and rhomboids, but no tenderness in Plaintiff's spine. *Id.* Plaintiff had 100% normal range of motion upon flexion in his cervical spine, but 50% range of motion upon extension, rotation, and bending. *Id.* at 357–58. Plaintiff had 5/5 muscle strength. *Id.* at 358. Dr. Kirpalani also observed normal gait, with heel and toe walking normal. *Id.*

Dr. Kirpalani reviewed an MRI of Plaintiff's spine that was taken on September 22, 2009. *Id.* The MRI of Plaintiff's cervical spine showed that Plaintiff's cervical spinal cord and visualized soft tissues appeared "unremarkable." *Id.* at 359. Dr. Kirpalani observed mild left focal disc protrusion at the C6-7 level, but "no evidence of central canal stenosis or neural foraminal narrowing." *Id.*

The MRI of Plaintiff's thoracic spine showed "mild central focal disc protrusion" "at the T6-T7, T7-T8, and T8-T9 levels, with "mild central canal stenosis" at the T8-T9 level but no neural foraminal narrowing. *Id.* Dr. Kirpalani noted that "[t]he remainder of the thoracic spine levels appear[ed] unremarkable without evidence of focal disc protrusion, disc extrusion, central canal stenosis or neural foraminal narrowing." *Id.* at 359.

United States District Court
Northern District of California

The MRI of Plaintiff's lumbar spine showed "mild interval worsening of the disc desiccatory changes most pronounced at the L4-5 and L5-S1 levels." *Id.* at 360. There was "no evidence of a focal disc protrusion, disc extrusion, central canal stenosis or neural foraminal narrowing" at the T12-L1 or L1-L2 levels. *Id.* At the L2-L3 level, Dr. Kirpalani noted mild broad-based disc protrusion and mild joint hypertrophy producing mild bilateral neural foraminal narrowing, but no evidence of central canal stenosis. *Id.* This "appear[ed] stable in comparison to the prior study." *Id.* At the L3-L4 level, there was moderate broad-based disc protrusion and mild bilateral facet joint hypertrophy producing mild central canal stenosis and "mild to moderate bilateral neural foraminal narrowing." *Id.* This "appear[ed] worse in comparison to the prior study." *Id.* At the L4-L5 level, there was moderate broad-based disc protrusion and mild bilateral facet joint hypertrophy producing mild central canal stenosis at mild to moderate bilateral neural foraminal narrowing. *Id.* At the L5-S1 level, there was moderate broad-based disc protrusion and mild facet joint hypertrophy with mild to moderate bilateral neural foraminal narrowing, but there was no evidence of central canal stenosis. *Id.*

Ultimately, after reviewing Plaintiff's MRI, Dr. Kirpalani concluded that there was "[n]o significant abnormality." *Id.* at 361. Dr. Kirpalani concluded that Plaintiff's symptoms were "uncertain and likely not all explained by one etiology." *Id.* Dr. Kirpalani concluded that Plaintiff "[c]ertainly [had] severe cervical/lumbar strain and significant myofascial component to pain," but there was "no evidence of [right] sided nerve impingement in cervical spine." *Id.* Dr. Kirpalani noted that "[c]omplicating matters regards to this patient's pain is the fact that insurance claim is still open, patient is pursuing litigation, and he is on disability." *Id.* Plaintiff declined medication, and was referred to physical therapy. *Id.* at 362.

### d. Kevin Z. Wang, M.D. (Treating Physician)

Plaintiff saw Dr. Kevin Z. Wang ("Dr. Wang") for a second opinion on October 12, 2009. *Id.* at 367–68. Dr. Wang noted that Plaintiff "appear[ed] in moderate distress due to pain" and Plaintiff "[d]escribed spasms in back." *Id.* at 370. Plaintiff had 100% normal range of motion

United States District Court
Northern District of California

upon flexion of his cervical spine with 50% range of motion upon extension, bending, and rotation. *Id.* Plaintiff's reflexes were normal and Plaintiff had 5/5 muscle strength. *Id.* at 370–71. Plaintiff's gait was normal, with normal heel and toe walking. *Id.* at 371.

Dr. Wang reported the same MRI findings as Dr. Kirpalani. *See id.* at 373–74. Dr. Wang found, as Dr. Kirpalani had found, that "although [Plaintiff] ha[d] multiple disc bulges/protrusions throughout spine on MRI," there was "no evidence of [right] sided nerve impingement in cervical spine." *Id.* at 374. Plaintiff's neurological examination was within normal limits. *Id.* Dr. Wang noted that Plaintiff expressed "[s]ignificant pain behaviors" and that Plaintiff was "exhibiting early signs of chronic pain and needs to be a[n] integral member of his treatment team to include active strategies for pain management." *Id.* Dr. Wang recommended that Plaintiff continue physical therapy and engage in "[a]ppropriate diet and exercise for weight loss." *Id.* at 374–75. Dr. Wang "encouraged [Plaintiff] to continue to be physically active and to incorporate daily aerobic activities to routine." *Id.* at 375. Dr. Wang also recommended an epidural steroid injection, which Dr. Wang performed on October 20, 2009. *Id.* at 375; *id.* at 394–97.

On November 10, 2009, Plaintiff had a follow up visit with Dr. Wang. *Id.* at 403. Plaintiff reported to Dr. Wang that the steroid injection "helped 50% with low back pain" and that Plaintiff "had some good days (3 days/week) with his back where he [wa]s able to function with min[imal] pain." *Id.* at 403. Plaintiff further reported to Dr. Wang that Plaintiff was going to physical therapy "and working with stretching program which has helped a lot." *Id.* Plaintiff told Dr. Wang that "he does not like to take medications." *Id.* Plaintiff "continue[d] to complain of diffuse neck and back pain with difficulty with prolong[ed] sitting," and Plaintiff stated that he was "sleeping only 4 hours a night because of pain." *Id.*

Dr. Wang's physical examination again showed that Plaintiff had 100% normal range of motion upon flexion, and 50% range of motion upon extension, bending, and rotation, with normal reflexes and 5/5 muscle strength. *Id.* at 404–05. Plaintiff's gait was normal. *Id.* at 405. Dr. Wang recommended that Plaintiff continue physical therapy, and that Plaintiff engage in

United States District Court
Northern District of California

1    appropriate diet and exercise for weight loss.  *Id.* at 406.

2          Plaintiff saw Dr. Wang again on March 17, 2010 and reported that he "continue[d] to have

3    sharp shooting pain radiating from his back to his right low leg around to knee" and that this pain

4    was "very difficult to tolerate."  *Id.* at 430.  Although Plaintiff reported that he was "dealing well

5    with his neck and mid back pain," Plaintiff was "not able to deal with the intermittent shooting

6    pains that interfere[d] with his life."  *Id.*  Plaintiff again reported that he did not like to take

7    medications because he worried about side effects.  *Id.*at 430–31.  Dr. Wang performed a physical

8    exam and noted that Plaintiff "appear[ed] in mild discomfort," but that Plaintiff was "more

9    comfortable since" Plaintiff's last visit.  *Id.* at 431.  Plaintiff had 70% normal range of motion

10   upon flexion, and 50% range of motion upon extension, bending and rotation, with normal

11   reflexes and 5/5 muscle strength.  *Id.* at 430–31.  Plaintiff's gait was normal.  *Id.* at 431.  Dr.

12   Wang again discussed pain management techniques with Plaintiff and advised Plaintiff that

13   Plaintiff would likely have chronic pain for the remainder of his life.  *Id.*  Dr. Wang advised

14   Plaintiff that surgery would not help "given MRI findings and clinical presentation," and Dr.

15   Wang "advised conservative care with medications and injections as needed."  *Id.* at 432.

16         On April 5, 2010, Plaintiff visited Dr. Wang for another epidural steroid injection.  *Id.* at

17   437.

18         **e.  Elliot Ryan Carlisle, M.D. (Examining Physician)**

19         Plaintiff saw Dr. Elliot Ryan Carlisle ("Dr. Carlisle") on March 17, 2010 for a spinal

20   surgery consultation.  *Id.* at 433.  Plaintiff reported to Dr. Carlisle that his low back pain was "4 to

21   5/10 in severity" with occasional 9/10 or 10/10 severity.  *Id.* at 434.  Plaintiff reported that he had

22   "some modest cervical discomfort and modest upper back discomfort," but that Plaintiff's primary

23   pain was in his lower back.  *Id.*  Dr. Carlisle performed a physical exam and found that Plaintiff

24   had "full motion of his cervical, thoracic, and lumbar spine, but discomfort with extremes of

25   flexion, extension and rotation of his lumbar spine."  *Id.*  Plaintiff had 5/5 motor strength and

26   normal gait.  *Id.*

27                                                                  10

28   Case No. 16-CV-00162-LHK
     ORDER DENYING PLAINTIFF'S MOTION FOR SUMARY JUDGMENT AND GRANTING
     COMMISSIONER'S CROSS-MOTION FOR SUMMARY JUDGMENT

An MRI of Plaintiff's spine showed "degenerative disc disease at C5-6 and C6-7, as well as several levels of thoracic degenerative changes with Schmorl's nodes." *Id.* at 435. The lumbar spine showed "the most significant findings of involvement of every disc level with some desiccation in Schmorl's nodes consistent with lumbar Scheurmann's disease," or humpback. *Id.* Dr. Carlisle found "no significant nerve root compromise and no indication for surgery." *Id.* Dr. Carlisle told Plaintiff to proceed with "conservative measures and oral medications as indicated, with weight loss and refraining from lifting heavy weights." *Id.* Dr. Carlisle "encouraged pool activity, weight loss and exercise." *Id.*

### f. Paul Reynolds, MD (Treating Physician)

Plaintiff saw Dr. Paul Reynolds ("Dr. Reynolds") on August 16, 2010 for an initial consultation. *Id.* at 470. Plaintiff identified his "current pain level as 4/10," but noted that the pain at its worst is 10/10 but could "be as low as 3/10." *Id.* Plaintiff told Dr. Reynolds that he stopped taking medication because it was not helping and made him "a zombie." *Id.* at 471. Plaintiff "walk[ed] stiffly," but Dr. Reynolds noted that Plaintiff's gait was "neurologically unimpaired." *Id.* at 472. Dr. Reynolds reviewed Plaintiff's MRI and noted a "disc protrusion at C6-7 without evidence of central canal stenosis or neural foraminal narrowing," "disc protrusions at the T6-9 levels" with "mild canal stenosis" at the T8-9 level, and worsened L3-4 and L4-5 bilateral foraminal narrowing. *Id.* at 472. "The narrowing at the L5-S1 level was mild to moderate, without central canal stenosis." *Id.* Dr. Reynolds concluded that "this appears to be either a whiplash associated chronic pain problem in evolution, a dynamic disc not fully appreciated, or the result of the syrinx." *Id.* Dr. Reynolds stated that "[t]hese conditions would most benefit from slow and progressive independent exercise at a level that will promote healing" and that the facet generated pain "would be best treated with progressive core strengthening and avoidance of further pain related posturing and movement restrictions." *Id.* Dr. Reynolds stated that "[t]he main thing is to start moving more normally at all times." *Id.*

Plaintiff saw Dr. Reynolds for follow up appointments on September 2, 2010 and October

21, 2010. *Id.* at 474, 476. Plaintiff indicated during both visits that his pain at the time of the visit was 4/10, with his average pain level fluctuating between 5/10 and 7/10. *See id.* at 474–76. Dr. Reynolds again noted that Plaintiff's gait was "neurologically unimpaired," though Plaintiff "moved slow." AR475.

On November 1, 2010, Plaintiff saw Dr. Reynolds to review recent MRI results. *Id.* at 478. The most recent MRI of Plaintiff's cervical spine showed a "2 mm disc bulge at C5-6 and broad based disc at C7-7 with eccentricity to the left and indentation of the spinal canal at that level." *Id.* at 479. Dr. Reynolds noted that Plaintiff was "stiff with antalgic gait." *Id.* Dr. Reynolds stated that he did "not think [Plaintiff] could return to any type [of] work at present," though Dr. Reynolds noted that "this is a temporary condition that should resolve within the next 6 months." *Id.* Dr. Reynolds felt that "epidural injections should allow for proper physical therapy." *Id.*

Plaintiff saw Dr. Reynolds again on December 6, 2010. *Id.* at 481. Plaintiff "indicated that the pain [was] about the same" and that his "neck felt better for a little while after" his most recent steroid injection, but that his "mid back and low back" were hurting worse. *Id.* Dr. Reynolds stated that Plaintiff "was sent to consider lumbar medial branch blocks," but the "presentation and MRI [were] not consistent with that type presentation" and that physical therapy was "the way to proceed." *Id.* at 482. Dr. Reynolds "encourage[d] [Plaintiff] to find a job at which he can work" which would "offset some of [Plaintiff's] depression regarding his current situation." *Id.*

Plaintiff's next visit with Dr. Reynolds was over a year later, on February 13, 2012. *Id.* at 483. Plaintiff "recalled that the [epidural steroid injection] helped for more than a year," but that Plaintiff was "having a recurrence" of the neck and lower back pain. *Id.* Dr. Reynolds described Plaintiff as "[n]eurologically intact" and that his lumbar region was "tender but without significant structural defect." *Id.* at 484. Dr. Reynolds noted the chronic low back pain and neck pain as "issues," in addition to Plaintiff's "weight gain and deconditioning." AR483. Dr. Reynolds

recommended a diagnostic medial branch block injection "for clarification of the pain generator," followed by radiofrequency ablation procedure so that Plaintiff could "advance his activity, loose [sic] some weight and get his back stronger." *Id.*

Plaintiff had follow up visits with Dr. Reynolds on February 27, April 23, and May 8, 2012. Dr. Reynolds scheduled Plaintiff for lower lumbar radiofrequency ablation procedures, and Dr. Reynolds continued to emphasize to Plaintiff "normal functionality and routine independent exercise." *Id.* at 489–90, 494, 498, 499.

On June 11, 2012, Plaintiff saw Dr. Reynolds and reported that he "was feeling very well" a few weeks ago but that he had been feeling greater pain recently. *Id.* at 501. Plaintiff found the muscle relaxers "very helpful" and Dr. Reynolds told Plaintiff "to increase to three times daily." *Id.* Plaintiff "move[d] about stiffly" and his gait was "antalgic and slow." *Id.* at 501. Dr. Reynolds noted that Plaintiff "should be progressing and was for a good while, until he began to have more sharp left sided lower back pain and difficulty in the aquatic exercise." *Id.* at 502. Dr. Reynolds noted that Plaintiff "most likely has some psychological impediment to progress." *Id.* Dr. Reynolds referred Plaintiff to a psychologist and asked Plaintiff to persist with physical therapy. *Id.* Plaintiff insisted "that there [was] something wrong not previously identified on the MRIs" and "insisted on yet another MRI of his spine." *Id.*

Plaintiff saw Dr. Reynolds twice in August 2012. *Id.* at 712, 715. Plaintiff stated that his "low back was starting to feel better" but that his "neck [was] getting worse." *Id.* at 712, 715. Dr. Reynolds found Plaintiff's symptoms were "difficult to put together." *Id.* at 716. Dr. Reynolds suggested an MRI of the thoracic outlet. *Id.*

On December 17, 2012, Plaintiff saw Dr. Reynolds again. *Id.* at 718. Dr. Reynolds noted that Plaintiff had a "[s]low non-impaired gait." *Id.* Dr. Reynolds again emphasized that "[m]indfulness and coping strategies" are important and that,"[m]ore importantly, at one level [Plaintiff] must allow himself to get better." *Id.* Dr. Reynolds stated that the radiofrequency ablation procedures had "allowed for persistent reduction in [Plaintiff's] low back pain." *Id.*

On December 20, 2012, Dr. Reynolds filled out a physical RFC questionnaire for Plaintiff. *Id.* at 731. Dr. Reynolds stated that Plaintiff was incapable of a "low stress" job, Plaintiff could walk less than one city block without rest or severe pain, and Plaintiff could sit and stand/walk for less than 2 hours. *Id.* at 732. Dr. Reynolds indicated that Plaintiff could sit no more than 30 minutes at one time before needing to get up and could stand no more than 30 minutes before needing to sit or walk around. *Id.* Dr. Reynolds stated that Plaintiff would need to take unscheduled breaks 8-10 times a day for 15-30 minutes at a time, and that Plaintiff could "rarely" carry less than 10 pounds and "never" more than 10 pounds. *Id.* at 733. Further, Plaintiff could "rarely" look down, turn his head, or hold his head in a static position, could "never" look up, could "rarely" twist or climb stairs, and could "never" bend, crouch, or climb ladders. *Id.* Dr. Reynolds also noted that Plaintiff could spend no more than 10% of the workday grasping objects, manipulating objects, or reaching his arms. *Id.* at 734.

Plaintiff saw Dr. Reynolds again in June and December 2013. Plaintiff informed Dr. Reynolds that he was diagnosed with carpal tunnel syndrome, but had no "w[rist] or hand pain per se." *Id.* at 861. Plaintiff continued to have pain generally, and Dr. Reynolds noted that Plaintiff walked with an "antalgic gait." *See id.* at 860. Dr. Reynolds noted that Plaintiff was making "some progress" with physical therapy, and Dr. Reynolds emphasized the "need for ongoing care." *Id.* at 862.

### g. Visits to Stanford Hospital and Clinics and Plaintiff's Shoulder Surgery

Plaintiff also made several visits to physicians at Stanford Hospital and Clinics beginning in August of 2012. *See id.* at 609. On September 5, 2012, Plaintiff's weight was recorded as 331 pounds. *Id.* at 639. Treatment notes indicate that Plaintiff's low back pain was improved by radiofrequency ablation procedures, and that Plaintiff was being seen for possible thoracic outlet syndrome. *See id.* at 650. A September 10, 2012 physical exam showed "slow antalgic gait," but Plaintiff was "able to walk on heels and toes." *Id.* at 651. Plaintiff had "significant tenderness" in his spine, but his upper and lower extremity strength was intact. *Id.*

14

After an updated MRI on his shoulder in October 2012, Dr. Gary S. Fanton ("Dr. Fanton") concluded that Plaintiff's "rotator cuff [was] intact" and there was "no evidence of cuff pathology." *Id.* at 655. Plaintiff's AC joint showed "mild arthrosis," but Plaintiff's shoulder strength was good and Plaintiff's range of motion in his shoulder was good. *Id.* An MRI of the cervical spine showed "no significant nerve root compression or spinal cord compression to explain [his] symptoms" and "no significant nerve root compression in the lumbar spine." *Id.* at 676. On October 8, 2012, Plaintiff was diagnosed with carpal tunnel syndrome. *Id.*

Plaintiff saw Dr. Fanton again on January 15, 2013. *Id.* at 750. A physical exam showed that Plaintiff's shoulder was tender along the anterior and posterior joint line, but nontender over the AC joint and "no pain with crossed arm abduction." *Id.* Dr. Fanton suspected a tear of the labrum and scheduled Plaintiff for an arthroscopic procedure. *Id.* at 750–51.

Dr. Warren D. King ("Dr. King") performed arthroscopic shoulder surgery on March 13, 2013. *See id.* at 767. The procedure showed "extensive degenerative fraying and tearing of the labral tissues. *Id.* at 768.

Plaintiff saw Dr. King for several follow-up appointments in 2013. AR882. Plaintiff largely reported similar pain symptoms. *See id.* However, on December 5, 2013, Plaintiff told Dr. King that his "overall deep pain in his shoulder has been gone" though Plaintiff stated that he continued to have pain in his pectoralis region. *Id.* at 871. A physical exam showed that Plaintiff was "neurovascularly intact" with "good sensory and no obvious muscle atrophy noted." *Id.*

### h. Robert Litman, MD (Treating Physician)

Plaintiff began seeing Dr. Robert Litman ("Dr. Litman") on October 18, 2010. Dr. Litman's treatment notes are sparse and difficult to discern. *See id.* at 521–25. Plaintiff complained to Dr. Litman in 2011 of "sharp pain in lower back," though on other dates Plaintiff described himself as feeling "alright." *See id.* at 524. Dr. Litman diagnosed cervical disc disease and prescribed Percodan for pain. *Id.* at 524–25.

On January 15, 2013, Dr. Litman filled out a physical RFC questionnaire for Plaintiff. *Id.*

15

at 892. Dr. Litman indicated that plaintiff could sit or stand/walk only less than 2 hours total in an 8-hour work day, though Dr. Litman did not specify any further time frame. *Id.* at 891. Dr. Litman checked that Plaintiff did not need a job that permitted shifting positions. *Id.* Dr. Litman did not fill out questions regarding when Plaintiff would need to take unscheduled breaks, but rather wrote that Plaintiff was "unable to work." *Id.* Dr. Litman checked that Plaintiff could "never" lift less than 10 pounds. *Id.* at 892. Dr. Litman also indicated that it was "unlikely" that Plaintiff's impairments would produce "good days" and "bad days," without further explanation. *Id.* at 892.

### i. Ernest Wong, MD (Non-Examining, Non-Treating Medical Expert)

State agency expert Dr. Ernest Wong ("Dr. Wong") reviewed the record in 2012 and concluded that Plaintiff had the RFC to occasionally lift and/or carry ten pounds; frequently lift and/or carry less than 10 pounds; stand and/or walk for a total of 2 hours; sit for approximately six hours out of an 8-hour work day; that Plaintiff was limited in his ability to push and/or pull in right upper extremity due to decreased range of motion in his right shoulder; that Plaintiff had postural limitations; that Plaintiff could frequently climb ramps and stairs, occasionally climb ladders/ropes/scaffolds; frequently balance; occasionally stop; kneel frequently; occasionally couch; and crawl frequently. *Id.* at 825–26. Dr. Wong concluded that plaintiff was limited to unskilled, sedentary work. *Id.* at 830.

### j. Arthur Brovender, MD (Non-Examining, Non-Treating Medical Expert)

Dr. Arthur Brovender ("Dr. Brovender"), board certified orthopedist, testified at the ALJ hearing as a medical expert. *Id. at* 43. Dr. Brovender summarized Plaintiff's file and concluded that Plaintiff suffered from "degenerative disc disease of the cervical and lumbrosacral spine" and that Plaintiff was "status post arthoscopy of his right shoulder." *Id.* at 56. Further, Dr. Brovender explained that Plaintiff has "mild to moderate right carpal tunnel syndrome," but there was no further discussion in the record as to treatment of Plaintiff's carpal tunnel. *Id.* at 45.

Factoring in Plaintiff's weight and pain, Dr. Brovender concluded that Plaintiff could "sit

16

for six hours," "stand for two hours and walk for two hours with normal breaks," with occasional postural. *Id.* at 46–47. Dr. Brovender recommended keeping Plaintiff "off ropes, ladders and scaffolds," and not having Plaintiff crawl. *Id.* Dr. Brovender further limited Plaintiff "to occasional reaching overhead and to occasional fine fingering with his right hand," and found that Plaintiff "could lift 10 pounds frequently and 20 to 50 pounds occasionally." *Id.*

### 2. Relevant Medical Evidence of Plaintiff's Non-Physical Limitations

#### a. Douglas Drucker, Ph.D (Treating Physician)

Plaintiff began to see Dr. Douglas Drucker ("Dr. Drucker") in June 2012 for Plaintiff's mental health. *Id.* at 684–85. Dr. Drucker's treatment notes are also sparse and difficult to discern. Dr. Drucker's notes reference Plaintiff's problem with an ingrown toenail, an eye injury, that Plaintiff had his gym clothes stolen out of his locker in 6th grade physical education class, Plaintiff's relationship with his girlfriend, and problems with Plaintiffs' health insurance. *See id.* at 627–32.

On August 23, 2012, Dr. Drucker wrote "PTSD—hard to talk in front of people." *Id.* at 629. On July 28, 2012, Dr. Drucker wrote that Plaintiff was "unable to work due to physical limitations from injuries sustained in car accident." *Id.* at 631. Dr. Drucker stated that Plaintiff had chronic pain, moderate depression and anxiety, moderate short term memory loss, and moderate concentration difficulties. *Id.*

On October 9, 2012, Dr. Drucker completed a mental medical source statement for Plaintiff. *Id.* at 684. Dr. Drucker checked that Plaintiff had a "fair" ability to understand and remember "detailed or complex instructions, and "good" ability to understand "very short and simple instructions." *Id.* Dr. Drucker further indicated that Plaintiff had "good" ability to carry out instructions and "good" ability to work without supervision, with "fair" ability to attend and concentrate. *Id.* Dr. Drucker noted that Plaintiff's chronic pain severely limited Plaintiff's ability to stay focused and concentrate. *Id.* Dr. Drucker checked that Plaintiff had "good" ability to interact with the public, his co-workers, and his supervisors. *Id.* at 685. Dr. Drucker stated that

United States District Court
Northern District of California

1    Plaintiff had "fair" ability to adapt to changes in the workplace, "good" ability to be aware of

2    normal hazards and react appropriately, and "poor" ability to use public transportation or travel to

3    unfamiliar places. *Id.*

4         On December 22, 2012, Dr. Drucker filled out a short-form evaluation for mental disorders

5    and a medical source statement. *See id.* at 724. Dr. Drucker reported that Plaintiff was oriented in

6    all spheres, but that Plaintiff's concentration was "impaired." *Id.* at 725. Dr. Drucker circled that

7    Plaintiff's associations were "goal directed," that Plaintiff was "focused on pain and effects of

8    pain," but that Plaintiff's judgment was "intact." *Id.* at 725–26. Dr. Drucker checked that Plaintiff

9    had a "good" ability to understand, remember, and carry out simple instructions, a "fair" ability to

10   understand, remember, and carry out complex instructions. *Id.* at 727. However, Dr. Drucker

11   checked "poor" in the remaining categories of functionality, including that plaintiff had a poor

12   ability to maintain concentration, attention, and persistence; perform activities within a schedule

13   and maintain regular attendance; complete a normal workday and workweek without interruption;

14   and ability to respond appropriately to changes in a work setting. *Id.*. Dr. Drucker indicated that

15   the "earliest date" these limitations applied was June 1, 2009. *Id.* Dr. Drucker further indicated

16   that Plaintiff was "unable to work at present" and for at least the next six months. *Id.* at 728.

17              **b. Cheryl-Grace E. Patty, Psy D (Examining Physician)**

18        Plaintiff was referred by the Department of Social Services to Dr. Cheryl-Grace Patty ("Dr.

19   Patty") for a complete mental evaluation. *Id.* at 688. Dr. Patty noted that Plaintiff drove himself

20   to the examination. *Id.* Plaintiff told Dr. Patty that "his memory [was] not what it used to be" and

21   that Plaintiff had "difficulty with comprehension and once had no problems." *Id.* Plaintiff

22   reported that he did not trust people as he once did, and that he felt "depressed and anxious

23   following his accident." *Id.*

24        Plaintiff told Dr. Patty that he had "difficulty some days taking care of self-dressing, self-

25   bathing, and personal hygiene." *Id.* at 689. Plaintiff drove himself, but also "depend[ed] on

26   family and friends." *Id.* Plaintiff could pay bills and handle cash, and was "able to go out alone."

27

28
Case No. 16-CV-00162-LHK
ORDER DENYING PLAINTIFF'S MOTION FOR SUMARY JUDGMENT AND GRANTING
COMMISSIONER'S CROSS-MOTION FOR SUMMARY JUDGMENT

*Id.* Plaintiff had good relationships with family and friends, though his relationships were "distant at times." *Id.* at 690. Plaintiff reported that he had difficulty focusing, and difficulty making decisions. *Id.* Plaintiff stated that his daily routine was "pain dependent," and included getting up, showering, stretching when he is able, eating, trying to ride his recumbent bike, and dealing with doctor's bills. *Id.* Dr. Patty stated that Plaintiff "appear[ed] genuine and truthful," and that he "was very cooperative and pleasant to work with." *Id.* Plaintiff's mood was "anxious" and his affect was "anxious, angry, and afraid and congruent with thought content." *Id.* Plaintiff "denie[d] any feeling of hopelessness, helplessness, or worthlessness." *Id.* On a recall test, Plaintiff recalled the names of three items immediately and after five minutes. *Id.* Plaintiff knew the name of the current president, and Plaintiff knew how President Kennedy died. *Id.* Plaintiff could perform math problems, spell "world" forward and backward, and Plaintiff followed his conversation with Dr. Patty "well." *Id.* at 691.

Dr. Patty noted that Plaintiff's symptoms were consistent with PTSD and that Plaintiff's condition was "poor," though it would "likely improve if [Plaintiff] continue[d] participating in psychotherapy." *Id.* at 692. Dr. Patty found "no restrictions" in Plaintiff's ability to carry out simple job instructions, Plaintiff's ability to do detailed and complex instructions, Plaintiff's ability to accept instructions from supervisors, and Plaintiff's ability to perform activities without special or additional supervision. *Id.* Dr. Patty found "moderate restrictions" in Plaintiff's ability to relate and interact with co-workers and the public, maintain concentration and attention, associate with day-to-day work activities, and maintain regular attendance. *Id.*

### c. State Agency Doctors (Non-Examining, Non-Treating)

On November 28, 2012, M.D. Morgan, MD ("Dr. Morgan") reviewed the record and determined that Plaintiff suffered from anxiety. *See id.* at 823–24. However, Dr. Morgan found that Plaintiff was "capable of performing simple and routine tasks." *Id.* at 824. Dr. Morgan concluded that Plaintiff was "not significantly limited" in Plaintiff's ability to carry out very short and simple instructions, to carry out detailed instructions, and to maintain attention and

concentration for extended periods. *Id.* at 826–28. Dr. Morgan found that Plaintiff was "moderately limited" in his ability to perform activities within a schedule, maintain regular attendance, and work in coordination with others or in proximity to others without being distracted by them. *Id.* Plaintiff was "moderately limited" in his ability to interact appropriately with the general public and his ability to get along with coworkers. *Id.*

On June 17, 2013, Anna M. Franco, Psy D. confirmed Dr. Morgan's assessment and found that there was no change in Plaintiff's disposition since Dr. Morgan's assessment. *See id.* at 853–54.

### 3. Relevant Non-Medical Evidence

#### 1. Plaintiff's Function Report

Plaintiff filled out a function report on July 3, 2012. *Id.* at 188. At the time of Plaintiff's disability application, Plaintiff reported that he weighed 305 pounds. *Id.* at 144. Plaintiff stated that his typical day involved stretching, taking very hot showers, reading or watching the news, trying to walk, talking to friends, going outside, eating meals, and watching TV. *See id.* Plaintiff stated that he fed and "love[d]" his two dogs, but his girlfriend walked the dogs and his friend helped with other dog care. *Id.* at 189. Plaintiff stated that he could not sleep regularly and that he woke up several times a night. *Id.* Plaintiff found it hard to dress himself, to use the toilet, to lift his legs into the shower with ease, to care for his hair, or to see the mirror in order to shave. *Id.* Plaintiff stated that he prepared himself simple meals weekly, but that it takes him "much longer than it used to." *Id.* at 190. Plaintiff paid his friends and neighbors to take care of his house and do yard work. *Id.* at 190–91. When Plaintiff's pain permitted, Plaintiff drove himself. *Id.* at 191. Plaintiff also shopped for himself, often by phone or computer, paid his own bills, and handled his own money. *Id.* Plaintiff spent time with others often. *Id.* at 192. Plaintiff stated that he was "fine" at following instructions, and that he handled stress "great." *Id.*

Plaintiff filled out an additional function report on May 14, 2013. *Id.* at 260. Plaintiff largely reported the same daily routine and physical limitations as Plaintiff reported in his 2012

20

report. *See id.* at 261–62. However, Plaintiff reported that he could not handle stress because it

was "a trigger for a massive pain onset." *Id.* at 266. Plaintiff noted that his ability to concentrate

"depend[ed] on his pain." *Id.* at 265.

### 2. Plaintiff's Testimony

Plaintiff testified at the ALJ hearing. Plaintiff explained that, after leaving his job at BAE

systems because of his car accident, Plaintiff tried to start his own business with his father and two

of his friends. *Id.* at 56. However, after Plaintiff worked for "about a week at home for maybe an

hour a day," Plaintiff experienced pain that prevented him from working. *Id.* Plaintiff testified

that he currently drives himself to the doctor's office, CVS, and to the grocery store. *Id.* at 59.

Plaintiff testified that, because of his pain, he stopped going to church and tutoring. *Id.* at 60.

Plaintiff testified that he lives with his fiancé and his two dogs. *Id.* He described his

typical day as doing "a lot of stretching" and taking multiple hot showers throughout the day. *Id.*

at 61. Plaintiff testified that he makes his fiancé a sandwich for her to take to work. *Id.* Plaintiff

also spends time talking on the phone to his dad. Plaintiff occasionally uses the computer during

the day, including working on seating charts for his wedding. However, Plaintiff stated that he

could not use the computer long because his hand goes numb. *Id.* at 61–62.

Plaintiff testified that he could not work because "it hurts" and he cannot concentrate. *Id.*

at 62. On a typical day, Plaintiff stated that he could sit approximately 15 to 35 minutes at a time

for two and a half to three hours total in an eight hour work day. *Id.* Plaintiff testified that he

could stand for "probably 10 to 15 minutes" and that he could walk approximately "three or four

blocks," but he occasionally falls. *Id.* at 63. Plaintiff testified that he could be on his feet for an

hour and a half to two hours in an eight hour work day. *Id.*

Plaintiff testified that he noticed a "big change" after his shoulder surgery in 2013, and that

his shoulder pain was "very much gone." *Id.* at 64. Plaintiff testified that his hands still get numb

and cold, and that he "get[s] pain shooting down when my neck goes." *Id.* Plaintiff testified that

his concentration depended on the day, but that he could usually "have a conversation with

21

somebody" and estimated that he could concentrate for "20 to 30 minutes" at a time. *Id.* at 65. Plaintiff stated that he needed help "at least weekly" with personal care, such as help putting on clothes. *Id.* Plaintiff testified that when he interacts with people he "can't breathe" and that he feels "completely overwhelmed." *Id.* at 66. Plaintiff states that he has a dream every night of being in the car that he was in during the accident. *Id.*

### a. Other Relevant Evidence of Plaintiff's Physical Limitations

In addition to the above record evidence, Plaintiff's father Kevin Fleming completed third-party function reports on June 29, 2012 and May 14, 2013. *See id.* at 166 & 245. These reports largely mirrored Plaintiff's own function reports.

Plaintiff's friends also submitted several letters on behalf of Plaintiff. One friend's letter, dated February 8, 2011, reported that "[l]ast year" he visited a club in San Francisco with Plaintiff, but Plaintiff needed to leave the club because it was too crowded and Plaintiff's "back gave out to the point where [Plaintiff] could not get up." *Id.* 207. Another friend's letter, also dated February 8, 2011, stated that Plaintiff "has not been able to [do] half of the activities" he used to do. *Id.* at 210. The friend had "seen [Plaintiff's] back seize while walking to the car from a football game," and the friend noted that Plaintiff was limited in his ability to complete household tasks. *Id.*

## B. ALJ's Decision

The ALJ applied the five-step evaluation process for determining disability described in 20 C.F.R. § 404.1520(a). *Id.* at 17–32. At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since August 13, 2009, the alleged onset date. *Id.* at 19. At step two, the ALJ concluded that Plaintiff suffers from a combination of severe impairments consisting of right shoulder joint mild osteoarthritis and tendonitis status post successful March 13, 2013 AC debridement, bursectomy, and acromioplasty; mild right carpal tunnel syndrome; bilateral thoracic outlet syndrome; degenerative disc disease without neurological deficits or nerve root compression; obesity; and secondary depression/anxiety/PTSD." *Id.* at 20. At step three, the ALJ found that Plaintiff's impairments did not meet or medically equal an impairment listed in 20 CFR

22

Part 404, Subpart P, Appendix 1. *Id.* at 24.

Prior to step four, the ALJ found that Plaintiff had the RFC to perform light work as defined in 20 CFR 404.1567(b), with the following restrictions:  inability to stand or walk for more than 2 hours total in an 8-hour workday; the inability to more than occasionally perform postural movements such as climbing stairs and ramps, balancing, stooping, and kneeling, but never crawling or climbing ladders, ropes, or scaffolding, and no more than occasional reaching overhead of performing fine motor tasks of fingering with the right upper extremity. *Id.* at 26. Further, the ALJ found that Plaintiff was further restricted to simple and complex tasks that have no more than occasional interaction with co-workers and the general public. *Id.*

In reaching this RFC determination, the ALJ gave "most weight" to the physical RFC limitations to which medical expert Dr. Brovender testified at the ALJ hearing. *Id.* With regards to Plaintiff's mental RFC limitations, the ALJ gave "most weight" to the state agency doctors' determinations, which the ALJ found to be "supported by direct references to the available medical evidence." *Id.* The ALJ gave less weight to the more extreme physical and mental limitations offered by Plaintiffs' treating physicians Dr. Drucker and Dr. Reynolds. *Id.* The ALJ also found Plaintiff's testimony regarding the degree and intensity of Plaintiff's pain to be less than credible.

At the hearing, the ALJ asked the VE if a person with Plaintiff's limitations could find work in the national economy. *Id.* at 70. The vocational expert testified that a person with Plaintiff's limitations could perform sedentary jobs such as a surveillance system monitor or telemarketer, as set forth in the DOT. *Id.*

At step four, the ALJ determined that Plaintiff was unable to perform his past relevant work. *Id.* at 30. At step five, the ALJ found that there were jobs that exist in significant numbers in the national economy that Plaintiff can perform. *Id.* As a result, the ALJ concluded that Plaintiff is not disabled as defined in the Social Security Act. *Id.* at 30–31.

## C.    The ALJ's Weighing of the Medical Evidence

Plaintiff contends that the ALJ erred in its decision because the ALJ failed to properly weigh the medical evidence. Specifically, Plaintiff contends that the ALJ failed to offer specific and legitimate reasons supported by substantial evidence in the record for crediting the opinions of the state agency doctors over the more restrictive opinions of Plaintiff's treating physicians. Relatedly, Plaintiff argues that because the ALJ failed to offer specific and legitimate reasons supported by substantial evidence for discounting the opinions of Plaintiff's treating physicians, the ALJ's RFC determination was not supported by substantial evidence in the record. The Court discusses each of Plaintiff's arguments in turn.

### 1. The ALJ Gave Specific and Legitimate Reasons for Discounting the Opinions of Plaintiff's Treating Physicians

"As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). "The opinion of an examining physician is, in turn, entitled to greater weight than the opinion of a nonexamining physician." *Id.* Accordingly, when evaluating medical evidence, an ALJ must give a treating physician's opinion "substantial weight." *Bray*, 554 F.3d at 1228. "When evidence in the record contradicts the opinion of a treating physician, the ALJ must present 'specific and legitimate reasons' for discounting the treating physician's opinion, supported by substantial evidence." *Id.* (citing *Lester*, 81 F.3d at 830). "However, 'the ALJ need not accept the opinion of any physician, including a treating physician, that is brief, conclusory and inadequately supported by clinical findings.'" *Id.* (quoting *Thomas*, 278 F.3d at 957).

As set forth above, the ALJ gave most weight to the opinions of Dr. Brovender and the state agency doctors, and the ALJ gave less weight to the more restrictive opinions of treating physicians Dr. Drucker and Dr. Reynolds. Because the ALJ relied on the opinions of Dr. Brovender and the state agency doctors to discount Dr. Drucker and Dr. Reynolds's opinions, the ALJ needed to articulate "specific and legitimate" reasons for discounting the opinions of Dr. Drucker and Dr. Reynolds, supported by substantial evidence in the record. *See Bray*, 554 F.3d at 1228.

24

### a. Dr. Drucker and Dr. Reynolds' Opinions

In affording "most weight" to Dr. Brovender and the state agency doctors' assessments of Plaintiff's restrictions, the ALJ acknowledged that the record contained "more restrictive RFC statements from treating physicians or providers" of Plaintiff. AR 26. Specifically, Dr. Drucker and Dr. Reynolds had both issued more restrictive RFC statements. *Id.* The ALJ explained, however, that Dr. Drucker's and Dr. Reynolds' assessments were "forms consisting primarily of short, fill-in answers and check-boxes." *Id.* The ALJ explained that these check-box forms could be minimized because they were not "supported by additional evidence, such as laboratory tests or a direct correlation to any of the claimant's impairments." *Id.*

The Ninth Circuit has held that ALJs are permitted to reject "check-off reports that [do] not contain any explanation of the bases of their conclusions." *Molina v. Astrue*, 674 F.3d 1104, 111 (9th Cir. 2012) (quoting *Crane v. Shalala*, 76 F.3d 251, 253 (9th Cir. 1996); *see also Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2004) (finding that ALJ properly disregarded conclusory evidence in the form of a checklist that lacked supportive objective evidence and was contradicted in other parts of the record). Here, in affording less weight to Dr. Drucker and Dr. Reynolds' check-off reports, the ALJ offered specific reasons for why the check-off reports of Dr. Drucker and Dr. Reynolds lacked supporting evidence and were not consistent with other parts of the record.

First, with regards to Dr. Drucker, the ALJ explained that Dr. Drucker indicated in his October 9, 2012 assessment that Plaintiff would have "'good' ability to work" except for a "'poor' ability to take public transportation to unfamiliar places." AR 26. However, Dr. Drucker's December 2012 assessment of Plaintiff—completed less than two months later—was drastically more restrictive. *Id.* In December 2012, Dr. Drucker indicated that Plaintiff had a "poor" ability to perform "in almost every category." *Id.* The ALJ explained that "'poor' assessments in so many categories of function were not supported by the sparse treatment notes from Dr. Drucker, which did not discuss chronic mental problems or record observations of objective clinical

findings." *Id.* Moreover, the ALJ noted, there was "no treatment course consistent with such severity of functioning with no referral to psychiatrist or physician for consideration of appropriate medication." *Id.*

The Court finds that the ALJ appropriately considered the fact that Dr. Drucker's sparse treatment notes did not support Dr. Drucker's more restrictive December 2012 assessment, and the fact that Plaintiff's overall "conservative course of treatment provided little in the way of support for [Dr. Drucker's] conclusory statement regarding [Plaintiff's] ability to work." *See Jones v. Astrue*, 499 F. App'x 676, 677 (9th Cir. 2012). These are "specific and legitimate" reasons, supported by substantial evidence in the record, for affording less weight to Dr. Drucker's December 2012 assessment, which was contained in a check-off form. *See Patton v. Colvin*, 2014 WL 12558849, at *10 (N.D. Cal. July 22, 2014) (finding specific and legitimate reasons supported ALJ's decision to discredit doctors' opinions where the doctors' opinions were contained in check-off forms and the doctors failed "thoroughly to explain their conclusions").

Further, the ALJ explained that he afforded less weight to Dr. Drucker's mental RFC assessment because Dr. Drucker's December 2012 assessment indicated an onset date of June 1, 2009 for Plaintiff's symptoms. AR 26; *see id.* at 727. Significantly, this onset date is not only three years before Dr. Drucker met Plaintiff in mid-2012, it is also two months *before* Plaintiff's August 13, 2009 car accident even occurred. *See* AR 330 (dating accident as occurring August 13, 2009). Thus, a June 1, 2009 onset date for mental health symptoms that are related to Plaintiff's *August 13*, 2009 car accident is not supported by the record. Accordingly, this is an additional "specific and legitimate" reason for the ALJ to discount Dr. Drucker's December 2012 mental RFC assessment.

Second, with regards to Dr. Reynolds' 2012 check-off RFC assessment, the ALJ explained that he gave less weight to the "morbidly restricted sedentary RFC" offered by Dr. Reynolds because it was not supported by the medical evidence or Plaintiff's course of treatment. AR 26. For example, the ALJ explained, Dr. Reynolds stated that Plaintiff "can only rarely lift even *less*

26

*than* 10 pounds, use his upper extremities only 10% of the day, and sit, stand, and walk for less than two hours in an 8-hour workday." *Id.* However, Plaintiff's "EMG/nerve conduction study did not confirm clinical radiculopathy," but merely "mild" right side carpal tunnel syndrome. *Id.* at 27. Dr. Reynolds himself wrote that Plaintiff's carpal tunnel caused Plaintiff "no w[ri]st or hand pain per se." *Id.* at 27; *see id.* at 861.[1] Further, the ALJ explained, "examinations repeatedly found [Plaintiff] to be fully neurologically intact, with full ('5/5') motor strength in the extremities, intact sensory, equal reflexes, and able to ambulate with a normal, unimpaired, or non-impaired gait." *Id.* at 27. The ALJ concluded there was thus "no objective foundation" for Dr. Reynold's "extreme exertional limitations." *Id.*

Plaintiff insists that the ALJ "cherry-picked" medical reports that described Plaintiff's gait as "normal" and Plaintiff as "neurologically intact," but that the ALJ ignored medical reports in which Plaintiff's gait was described as "antalgic," and in which Plaintiff had a limited range of motion and expressed pain. *See* Pl. Mot. at 18–21. Plaintiff also contends that the ALJ ignored the "objective imaging evidence" that showed Plaintiff as having "disc protrusions and buldges" and "disc degeneration." *Id.* at 17.

However, Plaintiff's citations to the record do not demonstrate that the ALJ erred in giving less weight to Dr. Reynolds' extreme physical limitations. Although Dr. Reynolds and physical therapists reported Plaintiff's gait as "antalgic," many of these same medical reports also state that Plaintiff was nonetheless able to walk on his toes and heels, and that Plaintiff's strength was intact. *See, e.g.*, *id.* at 651 (describing Plaintiff has having a "slow antalgic gait," but noting that Plaintiff was "able to walk on heels and toes" and noting that Plaintiff's upper and lower extremities strength was intact). Even Dr. Reynolds on one occasion noted that Plaintiff had a "[s]low non-impaired gait." *Id.* at 718. Moreover, Plaintiff's doctors, including Drs. Kirpalani,

---

[1] The actual quote from Dr. Reynolds' notes reads "[Plaintiff] has no worst or hand pain per se." AR 861. The ALJ interpreted Dr. Reynolds as intending to write "wrist" instead of "worst." *Id.* at 27. In any event, regardless of whether Dr. Reynolds meant "worst" or "wrist," the meaning is the same—Dr. Reynolds indicated that Plaintiff's carpal tunnel syndrome caused Plaintiff no further "pain per se." *Id.* at 861.

Case No. 16-CV-00162-LHK
ORDER DENYING PLAINTIFF'S MOTION FOR SUMARY JUDGMENT AND GRANTING
COMMISSIONER'S CROSS-MOTION FOR SUMMARY JUDGMENT

1    Wang, and Carlisle repeatedly found that Plaintiff had a normal gait.  *See, e.g.*, *id.* at 357–58, 370–

2    71, 405, 431, 433–34.  In addition, although Plaintiff did have a limited range of motion during

3    some medical visits and Plaintiff undoubtedly expressed pain, these facts do not contradict the

4    ALJ's overall finding that the record as a whole justified giving less weight to Dr. Reynolds'

5    check-off RFC assessment.  As set forth above in the Court's summary of the record, evidence in

6    the record shows an overall conservative course of treatment for Plaintiff's pain in which doctors

7    consistently encouraged Plaintiff to exercise, lose weight, and remain active.  *Id.* at 375, 409–10.

8    Plaintiff's medical records largely show 5/5 strength in Plaintiff's extremities with equal reflexes.

9    *See, e.g., id.* at 345, 434, 676.

10           Further, although Plaintiff's MRI results showed that Plaintiff had disc degeneration and

11   "disc protrusions and bulges," this does not show that the ALJ erred in weighing the medical

12   evidence.  Dr. Kirpalani reviewed Plaintiff's MRI results and recognized that Plaintiff had disc

13   protrusions and bulges in his spine.  *Id.* at 361.  Dr. Kirpalani nonetheless concluded that

14   Plaintiff's MRI showed "[n]o significant abnormality."  *Id.* at 361.  Dr. Kirpalani found "no

15   evidence of [right] sided nerve impingement."  *Id.*  Immediately after discussing Plaintiff's MRI

16   results, Dr. Kirpalani's treatment notes state that "[c]omplicating matters regards to this patient's

17   pain is the fact that insurance claim is still open, patient is pursuing litigation, and he is on

18   disability."  *Id.* at 361.

19           Plaintiff visited Dr. Wang for a second opinion, and Dr. Wang reached the same

20   conclusion as Dr. Kirpalani.  *Id.* at 374.  Dr. Wang recommended "[a]ppropriate diet and exercise

21   for weight loss" and "encouraged [Plaintiff] to continue to be physically active and to incorporate

22   daily aerobic activities to routine."  *Id.* at 375.

23           Similarly, Dr. Carlisle reviewed Plaintiff's MRI imaging and found "no significant nerve

24   root compromise and no indication for surgery."  *Id.* at 435.  Dr. Carlisle told Plaintiff to proceed

25   with a conservative course of treatment, and Dr. Carlisle "encouraged pool activity, weight loss[,]

26   and exercise."  *Id.*  Dr. Reynolds noted in 2012 that Plaintiff "may need a repeat MRI" of his

27

28
Case No. 16-CV-00162-LHK
ORDER DENYING PLAINTIFF'S MOTION FOR SUMARY JUDGMENT AND GRANTING
COMMISSIONER'S CROSS-MOTION FOR SUMMARY JUDGMENT

1   spine, but this was "mostly to allow for reassurance that continued rehabilitative efforts are the

2   primary pathway for recovery." *Id.* at 713. Dr. Reynolds continued to emphasize "normal

3   functionality and routine independent exercise." *Id.*

4       In light of the evidence cited by the ALJ, and the other substantial evidence in the record

5   demonstrating that Plaintiff had a full range of motion, normal reflexes, 5/5 strength, and no

6   significant abnormalities in his MRI results, the Court finds that the ALJ gave "specific and

7   legitimate" reasons, supported by substantial evidence, to discount the extreme limitations

8   provided by Dr. Reynolds in his December 2012 check-off form. *See Combs v. Astrue*, 387 F.

9   App'x 706, 708 (9th Cir. 2010) (holding that the ALJ permissibly rejected the medical opinion of

10  a treating physician which was unsupported by the record as a whole). Although other evidence in

11  the record might justify a different determination than the one the ALJ made, the ALJ's

12  determination satisfies the applicable legal standards. Thus, it is not the role of the Court to

13  second-guess it. *See Rollins v. Massanari*, 261 F.3d 853, 957 (9th Cir. 2001); *Batson*, 359 F.3d at

14  1193 ("[I]f evidence exists to support more than one rational interpretation, we must defer to the

15  Commissioner's decision.").

16       In sum, the Court concludes that the ALJ offered "specific and legitimate" reasons for

17  affording less weight to the reports of Dr. Drucker and Dr. Reynolds, and these reasons are

18  supported by substantial evidence in the record.

19                          **b. Dr. Litman and Dr. Patty**

20       Plaintiff further argues—in a single sentence—that the ALJ did not give "specific and

21  legitimate" reasons for affording less weight to the medical reports of Dr. Litman and Dr. Patty.

22  *See* Pl. Br. at 14. For several reasons, however, Plaintiff's argument is unavailing.

23       First, as to Dr. Litman, Dr. Litman's January 2013 questionnaire was submitted only to the

24  Appeals Council, not the ALJ. *See* AR 5 (listing Dr. Litman's report as appeals council exhibit);

25  *id.* at 33–37 (not listing Dr. Litman's report as among medical records submitted to ALJ). Thus,

26  to the extent Plaintiff argues the ALJ did not give "specific and legitimate" reasons to discount Dr.

27

28  Case No. 16-CV-00162-LHK
    ORDER DENYING PLAINTIFF'S MOTION FOR SUMARY JUDGMENT AND GRANTING
    COMMISSIONER'S CROSS-MOTION FOR SUMMARY JUDGMENT

1   Litman's report, this argument is not meritorious because the ALJ did not have Dr. Litman's

2   report to review.  To the extent that Plaintiff argues that Dr. Litman's January 2013 questionnaire

3   means that "substantial evidence" in the record does not support the ALJ's decision of non-

4   disability,[2] the Court disagrees.  Dr. Litman's January 2013 RFC questionnaire is, like the reports

5   of Dr. Drucker and Dr. Reynolds, a check-off form.  *See id.* at 891.  Dr. Litman not only failed to

6   provide explanations for the extreme limitations given on the check-off form, but Dr. Litman left

7   several check boxes on the form blank.  *See id.* at 891–92.  Further, Dr. Litman's extreme

8   limitations are contradicted by the record as a whole.  For example, Dr. Litman indicated that

9   Plaintiff's impairments were "unlikely" to produce "good days" and "bad days."  *Id.* at 892.

10  However, the record shows numerous occasions in which Plaintiff's doctors and Plaintiff himself

11  described Plaintiff's pain as severe on some days and not severe on other days.  *See, e.g.*, 403

12  (indicating that Plaintiff had "good days" where his back did not hurt); 690 (indicating Plaintiff

13  expressed that his daily routine was "pain dependent").  Moreover, Dr. Litman's sparse treatment

14  notes do not provide any reason for the extreme limitations offered in Dr. Litman's 2013

15  questionnaire.  *See id.* at 780–82.  Accordingly, even considering Dr. Litman's 2013 RFC

16  assessment, substantial evidence in the record supports the ALJ's determination that the extreme

17  exertional restrictions offered by Plaintiff's treating physicians are entitled to less weight than the

18  more moderate physical restrictions testified to which Dr. Brovender testified.

19          Second, as to Dr. Patty, Plaintiff does not explain how the ALJ failed to give appropriate

20  weight to Dr. Patty's report of Plaintiff's non-physical functional limitations.  The ALJ discussed

21  Dr. Patty's examination of Plaintiff in the ALJ's discussion of the record evidence.  *Id.* at 23, 25.

22  After considering the record, the ALJ concluded that Plaintiff had "no more than moderate

23  difficulties" in social functioning, and thus the ALJ's RFC restricted Plaintiff "to simple and

24

25  _____
    [2] Even if a medical report is not before the ALJ, but rather only the Appeals Council, that report is
26  nonetheless "part of the administrative record, which the district court must consider when
    reviewing the Commissioner's final decision for substantial evidence."  *Brewes v. Comm'r of Soc.*
27  *Admin.*, 682 F.3d 1157, 1163 (9th Cir. 2012).

28  Case No. 16-CV-00162-LHK
    ORDER DENYING PLAINTIFF'S MOTION FOR SUMARY JUDGMENT AND GRANTING
    COMMISSIONER'S CROSS-MOTION FOR SUMMARY JUDGMENT

1  complex tasks that have no more than occasional interaction with co-workers and the general

2  public." *Id.* at 25–26. This is entirely consistent with Dr. Patty's examination of Plaintiff, which

3  also suggested that Plaintiff had no more than moderate restrictions in social functioning. *See id.*

4  at 692. Indeed, the ALJ gave "most weight" to the state agency doctors' assessments of Plaintiff,

5  and the state agency doctors' report indicates that the state agency doctors gave weight to Dr.

6  Patty's assessment of moderate restrictions. *See id.* at 825 (affording weight to Dr. Patty's

7  assessment that Plaintiff "is capable of sustaining simple and routine tasks"). Thus, the record

8  shows that the ALJ gave weight to Dr. Patty's assessment of Plaintiff, and Plaintiff fails to explain

9  how the ALJ erred. *See* AR 25–26.[3]

10  In sum, the ALJ gave "specific and legitimate" reasons for discounting the extreme

11  limitations offered by Plaintiff's treating physicians, and the ALJ's decision is supported by

12  "substantial evidence" in the record.

13  **2.  The ALJ's RFC Determination was based on Substantial Evidence**

14  Plaintiff also argues that, because the ALJ "fail[ed] to find 'specific and legitimate'

15  reasons'" to discount the limitations provided in the reports of Dr. Drucker and Dr. Reynolds, the

16  ALJ's RFC determination failed to account for all of Plaintiff's limitations. *See* Pl. Br. at 26–27.

17  This argument is identical to Plaintiff's argument that the ALJ failed to provide "specific and

18  legitimate" reasons for discounting the opinions of Dr. Drucker and Dr. Reynolds which, as

19  discussed above, is not meritorious. Thus, for the reasons discussed above, Plaintiff's argument

20  that substantial evidence does not support the ALJs RFC determination also fails. For the reasons

21  set forth above, the Court finds that the ALJ properly weighed the medical evidence, and the

22  ALJ's RFC determination is supported by substantial evidence in the record as a whole.

23  **C.    ALJ's Evaluation of Plaintiff's Subjective Complaints**

24

25  [3] The record does show that, in discussing Dr. Patty's medical opinion, the ALJ cites Dr. Patty as
    noting that Plaintiff did *not* recall how President Kennedy died. *See* AR 23. A review of Dr.

26  Patty's report shows, however, that Dr. Patty wrote the opposite: Plaintiff did recall how President
    Kennedy died. *Id.* at 691. Regardless, there is no indication from the record that this had any

27  effect on the ALJ's assessment of Plaintiff's functionality. *See id.* at 23–25.

31

28  Case No. 16-CV-00162-LHK
    ORDER DENYING PLAINTIFF'S MOTION FOR SUMARY JUDGMENT AND GRANTING
    COMMISSIONER'S CROSS-MOTION FOR SUMMARY JUDGMENT

1    Plaintiff next argues that the ALJ erred in finding Plaintiff's subjective statements of the

2    degree and intensity of his pain to be less than credible.  *See* Pl. Mot. at 23–24.

3    Once a claimant produces medical evidence of an underlying impairment, the ALJ may not

4    discredit the claimant's testimony as to subjective symptoms merely because they are unsupported

5    by objective evidence.  *Lester*, 81 F.3d at 834.  Unless there is affirmative evidence of

6    malingering, the ALJ's reasons for rejecting the claimant's testimony must be "clear and

7    convincing."  *Id.*  "General findings are insufficient; rather, the ALJ must identify what testimony

8    is not credible and what evidence undermines the claimant's complaints."  *Id.*  In determining

9    whether an ALJ's credibility analysis was erroneous, the reviewing court must determine whether

10   the ALJ supported his finding with evidence "sufficiently specific to permit the court to conclude

11   that the ALJ did not arbitrarily discredit claimant's testimony."  *Thomas v. Barnhart*, 278 F.3d

12   947, 958 (9th Cir. 2002).  "If the ALJ's credibility finding is supported by substantial evidence in

13   the record, [the reviewing court] may not engage in second-guessing."  *Id.*

14   In this case, at the first step of the credibility analysis, the ALJ acknowledged that

15   Plaintiff's medically determinable impairments could reasonably be expected to cause Plaintiff's

16   alleged symptoms.  AR 30.  However, at the second step, the ALJ found that Plaintiff's statements

17   concerning the intensity, persistence, and limiting effects of his symptoms were "not entirely

18   credible" based on the record as a whole.  *Id.*

19   Reviewing the ALJ's decision and the record as a whole, the Court finds that the ALJ

20   offered several "clear and convincing" reasons for finding Plaintiff's statements regarding the

21   intensity of his pain to be less than credible.

22   First, with regards to Plaintiff's physical limitations, the ALJ found that Plaintiff's stated

23   degree of physical limitations were "quite extreme and conspicuously in excess of the objective

24   medical signs and laboratory findings in the record."  *Id.* at 28.  The record supports the ALJ's

25   conclusion.  Indeed, doctors routinely recommended a conservative course of treatment that

26   emphasized physical activity.  *See, e.g.*, *id.* at 331, 383, 406, 435.  For example, Plaintiff received

27

28
Case No. 16-CV-00162-LHK
ORDER DENYING PLAINTIFF'S MOTION FOR SUMARY JUDGMENT AND GRANTING
COMMISSIONER'S CROSS-MOTION FOR SUMMARY JUDGMENT

no treatment on the day of the car accident, August 13, 2009. The day after the accident, Plaintiff saw Dr. Thomas Johnson at a "minor injury clinic." *Id.* at 330–31. Dr. Thomas Johnson reported that Plaintiff had a "[n]ormal neurologic exam of extremities" and that Plaintiff "di[d] not appear to be seriously injured." *Id.* Dr. Thomas Johnson prescribed Percocet and told Plaintiff to rest and avoid painful movements. *Id.*

On August 17, 2009, four days after the accident, Plaintiff visited Dr. Kelli Johnson, who ultimately found "no significant abnormality." *Id.* at 345. She prescribed Plaintiff a muscle relaxer and referred Plaintiff to physical therapy. *Id.* Similarly, on September 30, 2009, Dr. Kirpalani referred Plaintiff to physical therapy. On October 12, 2009 and November 10, 2009, Dr. Wang encouraged Plaintiff to be physically active, lose weight, and to continue physical therapy. *Id.* at 375. In addition, on March 17, 2010, Dr. Carlisle encouraged physical activity and weight loss. *Id.* at 435. Even Dr. Reynolds on December 6, 2010 encouraged Plaintiff to find a job at which he could work, *id.* at 482, and on June 11, 2012 encouraged Plaintiff to continue with physical therapy, *id.* at 502.

Further, although Plaintiff experienced shoulder pain and underwent shoulder surgery in March 2013, that shoulder surgery appeared to be successful and Plaintiff himself testified that his shoulder pain was "very much gone." *Id.* at 64. In addition, although Plaintiff stated that he could only sit for 15 to 35 minutes at one time and stand for only 10-15 minutes at one time, Plaintiff's physical exams repeatedly showed that Plaintiff had intact strength, normal senses, and that Plaintiff mostly walked with a normal gait. *See, e.g.*, *id.* at 358, 370–71, 405, 434. Moreover, there is almost no treatment of significance for the entire year of 2011. The fact that Plaintiff did not seek medical treatment for an entire year further undermines Plaintiff's stated degree and intensity of his physical limitations.

Second, the ALJ noted that Plaintiff's stated degree of physical limitation was not reflected in Plaintiff's own report of his daily activities. *Id.* at 28. This is also supported by the record as a whole. Although Plaintiff stated that he needed assistance grooming himself and getting dressed,

*id.* at 89, record evidence also showed that Plaintiff engaged in sexual activity, prepared meals for himself and his girlfriend, drove himself to appointments and to CVS, attended football and baseball games, went to clubs in San Francisco, and traveled to Las Vegas. *See id.* at 59, 190, 207, 599; *see also Sims v. Colvin*, 2014 WL 3362286, at *5 (N.D. Cal. July 7, 2014) (finding record supported ALJ's credibility determination where claimant reported to be significantly impaired in daily activities but the record nonetheless showed she performed a "wide range of activities of daily living," including preparing basic meals and shopping for groceries).

Third, with regards to the Plaintiff's mental limitations, the ALJ found that Plaintiff's stated degree and intensity of his mental limitations were also not supported by the record because Plaintiff maintained close relationships with his family and friends. *Id.* at 28–29. This determination is also supported by substantial evidence in the record. Although Plaintiff reported that when he "tries to interact with other people, [he] can't breathe," record evidence showed that Plaintiff stayed in close contact with family and friends, went out to clubs, and was planning his own wedding. *See, e.g.*, *id.* at 192, 207. Moreover, the ALJ found that Plaintiff appeared "jovial throughout almost [the] entire [ALJ] hearing." *Id.* at 28–29.

In sum, considering the record as a whole, the Court finds that "[t]he contradictions to which the ALJ pointed are 'sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony'" about his physical and mental limitations. *Bennett v. Colvin*, 2014 WL 12584435, at *9 (N.D. Cal. Aug. 13, 2014) (finding that the ALJ appropriately found Plaintiff less than credible where Plaintiff's own statements of her physical limitations were contradicted by Plaintiff's daily activities and "her actual prescribed treatment" (quoting *Barnhart*, 278 F.3d at 958)); *see also Patton v. Colvin*, 2014 WL 12558849, at *13 (N.D. Cal. July 22, 2014) (finding ALJ properly discredited claimant's allegations where the claimant's claims of a disabling impairment were contradicted by the weight of the evidence in the record, such as the fact that the claimant could independently do several daily personal activities).

Plaintiff insists that the ALJ erred in discrediting Plaintiff because the record shows that

34

Plaintiff continuously sought treatment for his pain symptoms and that doctors found Plaintiff to be making a "good effort." *See* Pl. Br. at 24. However, although Plaintiff is correct that doctors indicated in the record that Plaintiff did not appear to be malingering, the record also shows several instances in which doctors indicated that Plaintiff was likely impeding his own progress. After Plaintiff's accident, Plaintiff visited a "minor injury clinic" and Plaintiff was prescribed only mild pain medication. Plaintiff did not take his pain medication because of Plaintiff's concern over side effects. *See id.* at 331, 346. Plaintiff's doctors, including Drs. Kelli Johnson, Kirpalani, Wang, and Carlisle repeatedly found that Plaintiff had a normal gait, was neurologically intact, and/or had 5/5 strength. *See, e.g.*, *id.* at 344, 357–58, 370–71, 405, 431, 433–34. Dr. Kirpalani concluded that Plaintiff's symptoms were "uncertain and likely not at all explained by one etiology," and Dr. Kirpalani stated in his treatment notes that "[c]omplicating matters regards to [Plaintiff's] pain is the fact that insurance claim is still open, patient is pursuing litigation, and he is on disability." *Id.* at 361. Dr. Kelli Johnson indicated on March 9, 2010 that she believed it was "grossly inappropriate" for Plaintiff's employer to ask Plaintiff to take 6 months off of work, and that this was setting Plaintiff up for life-long disability. *Id.* at 428. Dr. Wang emphasized that Plaintiff needed to be "a[n] integral member of his treatment team." *Id.* at 374. Dr. Reynolds noted that Plaintiff "most likely has some psychological impediment to progress," *id.* at 501, and that Plaintiff "must allow himself to get better." *Id.* at 719. Dr. Reynolds emphasized "normal functionality and routine independent exercise." *Id.* at 713.

Accordingly, even though evidence in the record shows that Plaintiff was not malingering and that Plaintiff made a good effort, the record also shows that Plaintiff's stated degree and intensity of his pain and own limitations is less than credible given the objective medical findings and Plaintiff's overall course of treatment. In sum, considering the record as a whole, the Court concludes that the ALJ's credibility determination is supported by "clear and convincing evidence." *Barnhart*, 278 F. 3d at 958.

**D.    Plaintiff's Obesity**

35

Plaintiff also argues briefly in his motion that the ALJ erred by "failing to include discussion of the disabling effects of [Plaintiff's] obesity." Pl. Br. at 26. The ALJ listed Plaintiff's obesity as a "severe impairment" at step two. *See* AR at 20. Plaintiff argues, however, that the ALJ did not consider at step three how Plaintiff's obesity interacted with Plaintiff's other "impairments vis-à-vis their relative listings." *Id.* Plaintiff also argues that the ALJ erred in failing to consider how Plaintiff's obesity interacted with Plaintiff's other impairments in determining Plaintiff's RFC, and thus Plaintiff contends that the ALJ erred at step five in determining that Plaintiff was not disabled. *Id.* However, for the reasons discussed below, the Court finds that the ALJ properly considered Plaintiff's obesity at step three and at step five.

First, Plaintiff has failed to show that the ALJ erred at step three by failing to consider Plaintiff's obesity as it relates to Plaintiff's other impairments and their respective listing. As the Ninth Circuit has explained, "obesity is not a separately listed impairment," and thus "a claimant will be deemed to meet the requirements if 'there is an impairment that, in combination with obesity, meets the requirements of a listing.'" *Burch v. Barnhart*, 400 F.3d 676, 682 (9th Cir. 2005). "Equivalence may also be determined if a claimant has multiple impairments, including obesity, none of which meets the listing requirement, but which when viewed in the aggregate are equivalent to a listed impairment." *Id.* The Rule explains that an ALJ "will not make assumptions about the severity or functional effects of obesity combined with other impairments," but rather "[o]besity in combination with another impairment may or may not increase the severity or functional limitations of the other impairment." *Id.* (quoting SSR 02-01p (2002)). The ALJ must "evaluate each case based on the information in the case record." *Id.* (emphasis removed).

Significantly, the Ninth Circuit has held that where a claimant "does not set forth any evidence which would support the diagnosis and finding of a listed impairment" with regards to the claimant's obesity, the claimant cannot show that the ALJ erred in failing to consider the claimant's obesity in determining whether the claimant "met or equaled the requirements of a listed impairment." *Id.* Here, although Plaintiff's weight and obesity is noted as a fact throughout

United States District Court
Northern District of California

the record, Plaintiff does not cite—and the Court has not found—any medical record or other testimony that describes how Plaintiff's obesity exacerbates Plaintiff's condition or otherwise impairs Plaintiff's ability to work. Accordingly, as the Ninth Circuit concluded in *Burch*, "the ALJ did not commit reversible error by failing to consider [Plaintiff's] obesity in determining whether [Plaintiff] met or equaled the requirements of a listed impairment" in step three. *Id.* (finding ALJ did not err at step three where the only references in the record to the plaintiff's obesity were "notes from doctors who observed weight gain, indicated that [she] is obese, and recommended that she participate in a medically supervised weight loss program").

Second, Plaintiff has failed to show that the ALJ erred by failing to consider Plaintiff's obesity in determining Plaintiff's RFC, and thus Plaintiff has failed to show that the ALJ erred at step five in finding that Plaintiff was not disabled. As set forth above with regards to the ALJ's weighing of the medical evidence, the ALJ afforded "most weight" to the limitations testified to at the ALJ hearing by Dr. Brovender. AR 26. In testifying about Plaintiff's RFC, Dr. Brovender explicitly told the ALJ: "What I factor in—I'm factoring into this Your Honor, is [Plaintiff's] weight." *Id.* at 46. The ALJ noted that Dr. Brovender testified that Plaintiff "was obese, with a BMI eventually climbing above 40, to 44." *Id.* at 24. In making his RFC determination, the ALJ adopted the "very restricted range of light work as testified to by [Dr. Brovender] during the hearing." *Id.* at 26.

Accordingly, because Dr. Brovender explicitly factored in Plaintiff's weight and the ALJ afforded "most weight" to Dr. Brovender's RFC limitations, the ALJ adequately considered Plaintiff's obesity in the ALJ's RFC determination. *See Richmond v. Colvin*, 2015 WL 6758119, at *5 (C.D. Cal. Nov. 5, 2015) (finding the ALJ did not err in failing to consider Plaintiff's obesity where "the consultative examiner whose opinion the ALJ gave great weight to in assessing Plaintiff's RFC was cognizant of Plaintiff's height and weight"). Moreover, Plaintiff "has not set forth, and there is no evidence in the record, of any functional limitations as a result of [his] obesity that the ALJ failed to consider." *Burch*, 400 F.3d at 684. Thus, the Court concludes that

United States District Court
Northern District of California

the ALJ did not err in failing to properly consider and evaluate Plaintiff's obesity, either at step

three or at step five.

## E.     The ALJ's Reliance on the VE's Testimony

Finally, Plaintiff argues that the ALJ erred at step five because the ALJ relied on the VE's

testimony that Plaintiff could perform the work of surveillance system monitor or telemarketer,

but the ALJ "failed to identify and resolve the apparent conflict" between Plaintiff's RFC and the

descriptions of these jobs in the DOT.  Pl. Br. at 23–24.

An ALJ may not "rely on a vocational expert's testimony regarding the requirements of a

particular job without first inquiring whether the testimony conflicts with the [DOT]." *Massachi*

*v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007).  "SSR 00-4p unambiguously provides that [w]hen

a [VE] . . . provides evidence about the requirements of a job or occupation, the adjudicator has *an*

*affirmative responsibility* to ask about any possible conflict between that [VE] evidence and the

information provided in the [DOT]." *Id.* (quoting SSR-004p).  SSR 00-4p further provides that

the adjudicator "*will ask*" the VE "if the evidence he or she has provided" is consistent with the

[DOT] and obtain a reasonable explanation for any apparent conflict." *Id.*  However, failing to

inquire whether the testimony conflicts with the DOT is the sort of "procedural error" that may be

"harmless" if there is no conflict between the VE's testimony and the DOT.  *Id.* at 1154 n. 19; *see*

*also Fritz v. Comm'r of Soc. Sec. Admin.*, 480 F. App'x 886, 887 (9th Cir. 2012) (holding that the

"ALJ's failure to ask the [VE] whether the expert's testimony contradicted the [DOT] was

harmless error because Fritz has not shown any contradiction to be present").

Here, the ALJ asked whether the VE's testimony was consistent with the DOT, and the

ALJ asked the VE whether the VE would advise the ALJ of any inconsistencies between the VE's

testimony and the DOT.  AR 67.  The VE responded that she would.  *Id.*  The VE then testified

that a hypothetical person with Plaintiff's limitations could perform jobs such as surveillance

system monitor or telemarketer.  *Id.* at 70.  With regards to the telemarketer position, Plaintiff's

attorney asked the VE at the hearing whether the VE "took into consideration occasional public

contact for the telemarketing?" *Id.* at 71. The VE responded that she took the public contact into

account, but in a telemarketing position "[y]ou are not dealing with the public face to face when

you're telemarketing. There's a wall between you, you can make faces at him or whatever you

want to do and they don't know and that to me eliminates public contact." *Id.* Plaintiff's counsel

did not ask any follow up questions, and did not ask the VE about any other apparent conflicts. *Id.*

at 71–72.

Plaintiff asserts that the ALJ was not entitled to rely on the VE's testimony because the job

of "telemarketer" is listed in the DOT as requiring "significant" interaction with other people, but

Plaintiff's RFC limited Plaintiff to "no more than occasional interaction with co-workers and the

general public." Pl. Br. at 28. Similarly, Plaintiff contends, the job of "monitor" is listed in the

DOT as requiring "significant" interaction with people, which conflicts with Plaintiff's RFC

limitation of no more than occasional interaction with others. *Id.* Plaintiff also asserts that the job

classification of "telemarketer" requires "frequent fingering," but Plaintiff's RFC limited Plaintiff

to "no more than occasional reaching overhead or performing fine motor tasks of fingering with

the right upper extremity." *Id.* According to Plaintiff, the ALJ had a duty to identify and resolve

these apparent conflicts, and because the ALJ did not do so, the ALJ was not entitled to rely on the

VE's testimony. *Id.* However, for the reasons discussed below, Plaintiff's arguments are not

persuasive.

First, the ALJ did not err with regards to the apparent conflict between the job of

telemarketer and Plaintiff's social RFC limitation. As discussed above, Plaintiff's counsel raised

this apparent conflict to the VE at the hearing. AR 71. The VE explained that he did not believe

that there was a conflict between the telemarketing position and Plaintiff's RFC because a

telemarketing position does not require face-to-face contact. *Id.* Plaintiff's counsel did not follow

up or ask further questions to the VE. *Id.* at 71–72. Thus, the Court finds that the record shows

that the ALJ received a "reasonable explanation" for the apparent conflict between the

telemarketer position and Plaintiff's RFC, and thus the ALJ was entitled to rely on the VE's

United States District Court
Northern District of California

testimony. *Massachi*, 486 F.3d at 1153.

Second, the ALJ did not err with regards to the apparent conflict between the job of surveillance monitor and Plaintiff's social RFC limitations. As discussed above, "the ALJ asked the VE to identify any conflicts between her testimony and the DOT." *Id*; *see* AR 67. The VE did not identify any conflicts with regards to the surveillance monitor position and Plaintiff's RFC limitations. *Id.* at 71. Plaintiff's attorney cross-examined the VE, and Plaintiff's attorney "did not challenge [the VE's] representation" that the surveillance monitor position was consistent with Plaintiff's RFC, even though Plaintiff's attorney specifically raised the conflict between the telemarketer position and Plaintiff's social RFC restrictions, as discussed above. *Wentz v. Comm'r of Soc. Sec. Admin.*, 401 F. App'x 189, 191 (9th Cir. 2010). Under these circumstances, the Court finds that "the ALJ met his obligations under *Massachi* and SSR 00-4p to investigate potential conflicts with the DOT, and his reliance on the VE testimony was therefore proper." *Id.* (finding ALJ did not err in relying on VE's testimony where the ALJ asked whether the VE's testimony conflicted with the DOT, the VE testified that it did not, and the claimant's counsel did not challenge the VE's representations); *see also Schneider v. Colvin*, 2015 WL 8294574, at *3 (N.D. Cal. Dec. 9, 2015) (finding ALJ did not err in relying on VE's testimony where the ALJ presented hypothetical questions to the VE and "specifically instructed the VE to indicate if his testimony deviated from the DOT," and where the plaintiff's counsel "did not question any conflict with the DOT").

Third, the ALJ did not err with regards to the apparent conflict between the job of telemarketer and Plaintiff's RFC limitations regarding "no more than occasional . . . fine motor tasks of fingering with the right upper extremity." *See* Pl. Br. at 28. As with the apparent conflict between the job of surveillance monitor and Plaintiff's social RFC limitations discussed above, the ALJ asked the VE whether the VE's testimony was consistent with the DOT and the ALJ asked the VE to identify any conflicts. AR 71–72. The VE did not identify any conflicts between the job of surveillance monitor and Plaintiff's physical RFC limitations, and Plaintiff's counsel did

40

1   not raise any apparent conflicts between the job of surveillance monitor and Plaintiff's physical

2   RFC limitations even though Plaintiff's counsel raised other conflicts with the VE.  *See id.*

3   Accordingly, the ALJ did not err in relying on the VE's testimony.  *See Schneider*, 2015 WL

4   8294574, at *3.

5        In any event, although Plaintiff contends that the job of telemarketer conflicts with

6   Plaintiff's RFC because the job requires "frequent fingering," Plaintiff's RFC included limitations

7   only with regards to *one* hand.  *See id.* at 26 (limiting Plaintiff to no more than occasional

8   "fingering with the *right* upper extremity").  Accordingly, because Plaintiff's limitation was only

9   with regards to one hand, "there is no straightforward inconsistency between the VE testimony

10  and the DOT."  *Lamear v. Colvin*, 2014 WL 6809751, at *1–2 (D. Ore. Dec. 1, 2014) (noting that

11  "every other court in [the District of Oregon] that has addressed" the issue has concluded that

12  there is no conflict between a "limitation on handling, fingering, and reaching with one hand" and

13  a DOT job description that requires "frequent handling, fingering, and reaching generally"); *see*

14  *also Sims*, 2014 WL 3362286, at *7 (finding that the job duty of "frequent reaching" did "not

15  require reaching with *both* arms").  "In the absence of an apparent conflict, the court need not

16  substitute its judgment for that of the VE."  *Lamear*, 2014 WL 6809751, at *7.  Thus, the Court

17  concludes that the ALJ properly relied on the VE's testimony, and Plaintiff has failed to show

18  error.

19  **IV.    ORDER**

20       For the foregoing reasons, IT IS ORDERED THAT:

21       1.   Plaintiff's motion for summary judgment is DENIED;

22       2.   Commissioner's cross-motion for summary judgment is GRANTED; and

23       3.   The Clerk shall close the file.

24  **IT IS SO ORDERED.**

25  Dated: June 29, 2017                    _____

26                                          LUCY H. KOH
                                            United States District Judge
27
                                            41
28  Case No. 16-CV-00162-LHK
    ORDER DENYING PLAINTIFF'S MOTION FOR SUMARY JUDGMENT AND GRANTING
    COMMISSIONER'S CROSS-MOTION FOR SUMMARY JUDGMENT